COURT OF APPEALS OF VIRGINIA

Present: Judges Chafin, Russell and Senior Judge Clements
Argued by teleconference

UNPUBLISHED

COMMONWEALTH OF VIRGINIA

v.      Record No. 0212-18-2

KENNETH DARRELL JENKINS

MEMORANDUM OPINION* BY
JUDGE WESLEY G. RUSSELL, JR.
JULY 10, 2018

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Beverly W. Snukals, Judge

Virginia B. Theisen, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellant.

Samantha Offutt Thames, Assistant Public Defender, for appellee.

Pursuant to Code § 19.2-398(A)(2), the Commonwealth of Virginia appeals the circuit

court's pretrial order granting Kenneth Darrell Jenkins' motion to suppress evidence seized by

police prior to his arrest on July 19, 2017. On appeal, the Commonwealth contends that the trial

court erred in finding that the police lacked a reasonable, articulable suspicion of criminal activity to

support the stop of Jenkins. For the reasons that follow, we reverse.

BACKGROUND

Prior to trial, Jenkins filed a motion to suppress, arguing that an investigative detention

violated his Fourth Amendment rights because police lacked reasonable, articulable suspicion that

he was engaged in criminal activity. At the January 31, 2018 motion to suppress hearing, the only

evidence offered by either party was the testimony of Detective Michael Poerstel, the law

enforcement officer who initiated the detention in question.

_____

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Poerstel testified that, during the summer of 2017, he was assigned to the Fourth Precinct Focus Mission Team. The team focused on activities in the Brooklyn Park Boulevard area of Richmond ("Brooklyn Park"), with a substantial portion of its time being spent investigating illegal drug activity.

Two years earlier, Poerstel served an arrest warrant on Jenkins.[1] More recently, Poerstel received information from Detective Jon Bridges that "an individual named Kenneth Jenkins" was involved in a January 2017 homicide investigation that Bridges was conducting. Between January and July of 2017, Bridges continued to contact Poerstel about Jenkins, including providing information that Jenkins was involved with disposing of a firearm that was involved in a homicide and that Jenkins was "actively involved" in the distribution of narcotics in Brooklyn Park. In the month preceding Poerstel's detention of Jenkins, Poerstel received information from Bridges on multiple occasions, including a report seven days prior to the detention. Bridges informed Poerstel that a confidential informant had reported that Jenkins was selling narcotics in that area.

In addition to the information supplied by Bridges, Poerstel also searched for information about Jenkins in the Richmond Police Department records management system and learned that Jenkins had had field contacts related to narcotics with the police department and had been involved in an assault by mob. Poerstel saw "alerts," including a reference that Jenkins was a gang member, that Jenkins was a narcotics seller or user, and that he probably was armed. The alerts also indicated that Jenkins was subject to a barment in the area.[2] Poerstel's review of the records management system did not reveal any arrests for narcotics offenses.

---

[1] The record does not reveal the charge upon which Jenkins was arrested.

[2] The system simply referenced a barment in the area; it did not specify the exact location. Poerstel learned of the specific location (and that it was a few blocks away) after detaining Jenkins.

Around 6:15 on the evening of July 19, Poerstel was on patrol in Brookland Park when he and his partners saw Jenkins. Poerstel described the area where the officers first encountered Jenkins as having "a very high level of drug activity."

Jenkins was walking with two other men in the opposite direction of Poerstel's patrol car. Poerstel described one of the other men as older and having a disheveled appearance with hollowed cheeks, sunken features, and dirty clothes. Poerstel felt that his appearance was consistent with a narcotics user.

The officers saw the three men walk a short distance to a convenience store known to the police from confidential informants as a business in which drug transactions occur. Poerstel watched Jenkins and the older man walk inside while the third man stood outside watching the police vehicle. Based on his experience policing the area for drug activity, Poerstel suspected that Jenkins and the older man were conducting a narcotics transaction inside the store while the third man acted as a lookout outside the store. He testified that multiple confidential informants and arrestees had informed him that, when police were present on the street, drug sellers and their customers would enter this particular convenience store to conduct drug transactions out of police view.

Shortly after he had entered the store, Jenkins exited the store alone and began walking back in the direction from which he had come. The officers circled the block and pulled into an alley in front of Jenkins. Upon seeing the officers, Jenkins abruptly turned around and walked in the opposite direction towards a barber shop. In one hand, Jenkins carried a soda can that he presumably had acquired in the convenience store; his other hand was "cupped" as if holding something small. The officers stopped Jenkins before he could enter the barber shop.

The footage from Poerstel's body camera revealed the following exchange:

Poerstel: Hey, what's going on sir?

- 3 -

Jenkins:  Alright.

Poerstel:  Alright?  Just step over here for me.  Do you have any weapons or anything on you?

Jenkins:  No.  I don't want you to search me [inaudible].

Poerstel:  Put your hands out to the side.

Jenkins:  Man . . . what are you talking about?

Poerstel:  Just making sure you don't have any weapons on you.

Poerstel testified that "the first action I took was to ask him if he had weapons and to pat him down."  Poerstel explained that multiple factors led him to pat Jenkins down, including:

> the information that I had advising about his involvement in a homicide and dealing with a firearm.  There was . . . the alert of possibly armed.  There was the - - there were the observations that I made that day, as I said, made me believe, from activities taking place, specifically drug activity or possibility of a drug transaction, and then I know that individuals who sell drugs carry firearms for protection, and then the area itself, as I said, high narcotics activity, but also associated with violent crime with it.

During the pat down, Poerstel did not detect any weapons, but did feel what he believed to be a prescription pill bottle in Jenkins' pants pocket.  Poerstel called Bridges and also requested that a canine unit come to the scene.  Approximately seventeen minutes passed from the time Poerstel stopped Jenkins until the time the canine arrived.  When the drug dog arrived, it alerted on Jenkins.  Officers then searched Jenkins, discovering a pill bottle containing suboxone and marijuana and a small bag containing heroin.

At the motion to suppress hearing, Jenkins argued that the initial investigative stop, the pat down, and the extra time needed to secure the dog all violated his rights under the Fourth Amendment.  The trial court ruled:

> I think after hearing everything[,] I have to say that . . . there are a lot of cases that deal with the second and third [issues], that you presented to me, but the first issue really has to go with my gut,

- 4 -

which is what are the totality of circumstances that give rise to a reasonable, articulable suspicion of drug activity?

And I just -- I just don't see it in this case. And that's why I tried to list all of the things in favor of the Commonwealth, and I think that it's so much easier for us to sit here and, you know, Monday morning quarterback the officers, when they're out there in the middle of doing everything, and I just think that it's just -- it fails *ever so slightly*; in that, if there was maybe a throwing movement, if there was a hand-to-hand transaction, if there was something more that I could hang my hat on for that drug transaction, then I think the stop would have been appropriate.

I think, clearly, if you get past [the initial stop], the Commonwealth is correct. I think the pat down would have been appropriate and I think the canine would have been appropriate, but I think the first step is just missing ever so slightly, given the cases that I've looked at, and so for that reason I'm going to suppress the evidence.[3]

(Emphasis added).

Although the trial court did not enter the order memorializing its ruling from the January 31, 2018 suppression hearing until February 21, 2018, the Commonwealth noted its appeal of the suppression ruling on February 7, 2018. The initial sentence of the notice states: "The Commonwealth of Virginia, pursuant to Code § 19.2-398, hereby appeals to the Court of Appeals of Virginia from the order of this Court that prohibited the use of certain evidence at trial on the grounds such evidence was obtained in violation of the provisions of the Fourth Amendment." In the notice of appeal, the Commonwealth acknowledges that "[t]he order granting [Jenkins'] motion to suppress has yet to be entered . . . ." The notice of appeal identifies "January 31, 2018" as the "[c]ourt date" that is material to the appeal.

---

[3] Jenkins did not file a cross-appeal regarding the circuit court's conclusion that, if the initial stop had been valid, "the pat down would have been appropriate" and elongating the stop for "the canine would have been appropriate." See Code § 19.2-401. Thus, those issues are not before us in this appeal.

ANALYSIS

I.  Jenkins' Jurisdictional Challenge

Preliminarily, Jenkins argues that we are without jurisdiction to hear the Commonwealth's appeal.  He asserts that the Commonwealth's notice of appeal suffers from two fatal defects.  First, he argues that the notice of appeal is defective because the Commonwealth filed it before the circuit court entered the order from which the appeal is taken.  Second, he claims the notice of appeal is deficient in that it does not sufficiently specify the ruling of the circuit court being appealed.

Jenkins' jurisdictional arguments require us to interpret the relevant statutory provisions and Rules of the Virginia Supreme Court.  As such, the arguments present questions of law subject to *de novo* review.  Belew v. Commonwealth, 284 Va. 173, 177, 726 S.E.2d 257, 259 (2012).  We are mindful that, because the statutes allowing the Commonwealth to appeal in certain specified instances are "in derogation of the general constitutional prohibition against appeals by the Commonwealth," we must construe those statutes against the Commonwealth.  Commonwealth v. Hawkins, 10 Va. App. 41, 44, 390 S.E.2d 3, 5 (1990); however, we are to avoid construing the relevant statutes "in a manner that 'leads to absurd results.'"  Commonwealth v. Mitchell, No. 0741-13-3, 2013 Va. App. LEXIS 251, *5 (Va. Ct. App. Sept. 10, 2013) (quoting Bowling v. Commonwealth, 51 Va. App. 102, 109, 654 S.E.2d 354, 358 (2007)).[4]

A.  The notice of appeal was timely filed

The filing of the notice of appeal in a pretrial appeal by the Commonwealth is governed by Code § 19.2-400.  That section provides, in pertinent part, that

---

[4] Unpublished opinions of this Court, while having no precedential value, are nevertheless persuasive authority.  Otey v. Commonwealth, 61 Va. App. 346, 350 n.3, 735 S.E.2d 255, 257 n.3 (2012).

> [n]o appeal shall be allowed by the Commonwealth pursuant to subsection A of § 19.2-398 *unless within seven days after entry of the order of the circuit court from which the appeal is taken*, and before a jury is impaneled and sworn if there is to be trial by jury or, in cases to be tried without a jury, before the court begins to hear or receive evidence or the first witness is sworn, whichever occurs first, the Commonwealth files a notice of appeal with the clerk of the trial court. . . . *All other requirements related to the notice of appeal shall be governed by Part Five A of the Rules of the Supreme Court.*

(Emphasis added). Jenkins argues that, because the Commonwealth's notice of appeal was filed *before* the circuit court entered the order granting the motion to suppress, the Commonwealth failed to comply with the statutory command that the notice be filed "within seven days *after* entry of the order of the circuit court from which the appeal is taken." (Emphasis added).

While having some facial appeal, such a construction fails to give effect to the portion of Code § 19.2-400 that provides that "[a]ll other requirements related to the notice of appeal shall be governed by Part Five A of the Rules of the Supreme Court." Pertinent here, Rule 5A:6(a) provides that "[a] notice of appeal filed after the court announces a decision or ruling – but before the entry of such judgment or order – is treated as filed on the date of and after the entry."

Applying this provision to the instant case leads to the conclusion that the notice of appeal was timely filed. If the notice of appeal "is treated as filed on the date of and after the entry [of the order]," Rule 5A:6(a), it was filed "within seven days after entry of the order of the circuit court from which the appeal is taken" as required by Code § 19.2-400. As a result, Jenkins argues that this provision of Rule 5A:6(a) is inapplicable in pretrial appeals by the Commonwealth because it is inconsistent with the statutory requirements. We disagree.

First and foremost, we note that the text of Code § 19.2-400 evinces the General Assembly's intention that pretrial appeals by the Commonwealth would be governed in part by Part 5A of the Rules of the Virginia Supreme Court. The statute expressly provides that "[a]ll other requirements related to the notice of appeal shall be governed by Part Five A of the Rules

- 7 -

of the Supreme Court. . . ," indicating that the General Assembly intended for the statute to be read in concert with Part 5A of the Rules. Thus, unless there is an inherent inconsistency between a statutory requirement and Part 5A of the Rules, the two should be harmoniously read.

Our conclusion that this provision of Rule 5A:6(a) is consistent with and a compliment to the statutory commands of Code § 19.2-400 stems from our recognition of what the provision is and what it is not. The provision is neither intended to nor does it affect the substantive responsibilities of a party filing a notice of appeal in this Court. It does not alter or extend the deadline by which the notice of appeal is due: "seven days after entry of the order" in pretrial appeals by the Commonwealth, Code § 19.2-400, and "within 30 days from the date of any final judgment order, decree or conviction" in other appeals to this Court. Code § 8.01-675.3.[5]

Properly understood, the relevant portion of Rule 5A:6(a) is nothing more than a deeming provision. It instructs this Court what filing date to assign to a notice of appeal that is filed before the order appealed from is entered. Its obvious purpose is to avoid the result sought by Jenkins here: dismissal of an appeal when the Commonwealth has provided *more* notice of its intent to appeal than the statute requires.

Our conclusion also is consistent with what we previously have recognized as the purpose behind the relatively short and strict deadlines applicable to pretrial appeals by the Commonwealth. The purpose of the deadlines is to "allow for the prompt determination of

---

[5] Although the number of days is different, we discern no difference between the General Assembly's use of "seven days *after*" in Code § 19.2-400 and "*within* 30 days *from*" in Code § 8.01-675.3. The natural reading of both assumes that, in the normal course, the order will be entered first with the notice of appeal to follow within the prescribed deadline. Thus, to the extent that Rule 5A:6(a) is inconsistent with Code § 19.2-400, it is similarly inconsistent with Code § 8.01-675.3. This would render the relevant portion of Rule 5A:6(a) a nullity because "[i]n the case of any variance between a rule [of the Supreme Court] and an enactment of the General Assembly such variance shall be construed so as to give effect to such enactment." Code § 8.01-3(D). We decline to adopt an interpretation that would render one of the Rules of the Supreme Court of Virginia a nullity.

whether a prosecution can effectively move forward or whether a defendant should be released." Mitchell, 2013 Va. App. LEXIS at *8. "The point of these statutory deadlines, however, is not formality for formality's sake." Id.

Our decision in Mitchell is instructive. At the time Mitchell was decided, the pretrial appeal statute provided that the Commonwealth's petition for appeal was due fourteen days from the filing of the relevant hearing transcript and was not tied to the circuit court's order regarding the motion. Id. at *6. In Mitchell, however, the transcript of the suppression hearing was ordered and filed more than fourteen days *before* the trial court ruled on the motion to suppress. Id. After acknowledging that the statute did "not expressly address the effect of an early . . . filing . . . ," we concluded "that premature filings do not necessarily compel dismissal, even when the language of the applicable rule does not address the impact of the premature filing." Id. at 10-11 n.3.[6] Accordingly, despite the lack of an equivalent to Rule 5A:6(a) regarding the filing of petitions for appeal, we declined to dismiss the Commonwealth's appeal in Mitchell.

Consistent with the relevant language in Code § 19.2-400 and Rule 5A:6, the purpose behind both, and the reasoning of Mitchell, we conclude that the notice of appeal was timely filed.

### B. The notice of appeal was sufficiently specific

Jenkins next argues that the notice of appeal is defective because it did not "provide proper notice of the matter [the Commonwealth] intended to appeal." In support of his argument, Jenkins cites this Court's decision in Commonwealth v. Dubois, No. 0944-15-4, 2015 Va. App. LEXIS 324 (Va. Ct. App. Nov. 10, 2015). Jenkins' reliance on Dubois is misplaced.

---

[6] Although the deeming provision of Rule 5A:6(a) was not at issue in Mitchell because the issue in that case was the filing of a petition for appeal as opposed to a notice of appeal, the Mitchell majority cited the deeming provision of Rule 5A:6(a) as persuasive authority, which strongly suggests that the provision applies to pretrial appeals by the Commonwealth. Mitchell, 2013 Va. App. LEXIS at *10-11, n.3.

In <u>Dubois</u>, we held that a notice of appeal filed by the Commonwealth was fatally defective because it failed to sufficiently identify the specific matter being appealed.[7]  Although the Commonwealth's notice included the style and the case number, we noted that

> the Commonwealth's May 26 notice of appeal merely lists the case number for Dubois' case and specifies that it is a 'Notice of Interlocutory Appeal pursuant to Virginia Code § 19.2-398(A)(2).' . . . [T]his reference to the Code requires a review of the record to determine if there was only a single motion to suppress decided. This clearly fails to meet the required standard of clarity that the notice 'on its face and without reference to other documents in the record' identify the order being appealed.  The notice fails to contain any information identifying the judgment being appealed; the notice does not include the date of the underlying hearing, the date of the letter opinion of the court, or even a summary of the court's ruling.  Further, the notice of appeal does not even state that the Commonwealth is appealing to the Court of Appeals. Thus, on its face, this notice of appeal . . . gives no indication as to what judgment is being appealed and to which court.  We hold that the docket number and the reference to Code § 19.2-398 are insufficient to adequately identify the order being appealed.

<u>Id.</u> at *11-12 (internal quotation marks, citation and footnote omitted).

Unlike the May 26 notice of appeal in <u>Dubois</u>, the notice here stated the following on its face:  the Commonwealth was appealing to this Court; it sought reversal of the ruling of the circuit court, which the notice summarizes as prohibiting "the use of certain evidence at trial on the grounds such evidence was obtained in violation of the provisions of the Fourth Amendment"; and that the hearing that led to the ruling was held on January 31, 2018.  Thus, without reference to other documents in the record, the notice informed Jenkins that the Commonwealth was appealing the circuit court's ruling granting his motion to suppress evidence

---

[7] In <u>Dubois</u>, there were two notices of appeal filed, and we found each to be fatally defective.  We struck from the record a June 2 notice of appeal that sufficiently identified the order appealed from and had been timely filed because it was not signed by the attorney for the Commonwealth and that oversight had not been corrected despite it having been brought to the Commonwealth's attention.  <u>Dubois</u>, 2015 Va. App. LEXIS 324 at *9.

- 10 -

that was heard on January 31, 2018.[8]  Thus, Jenkins was fully informed regarding the specific nature and scope of the matter being appealed and to which court the Commonwealth was appealing.  Accordingly, the notice of appeal was sufficiently specific.  See Evans v. Commonwealth, 61 Va. App. 339, 344, 735 S.E.2d 252, 254 (2012) (recognizing that "insubstantial defects in a timely filed appeal should not be fatal where no genuine doubt exists about who is appealing, from what judgment, to which appellate court") (internal quotation marks and citations omitted).

### II.  The officers had sufficient reasonable, articulable suspicion for the initial stop

#### A.  The Fourth Amendment and the standard of review

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures . . . ."  U.S. Const. amend. IV.  Warrantless police-citizen encounters can, but do not necessarily, implicate the Fourth Amendment.  Such encounters have been divided into three basic categories:  consensual encounters, which do not implicate the Fourth Amendment; Terry stops, which "are brief investigatory stops which must be based on specific and articulable facts which, taken together with rational inferences from these facts, reasonably warrant a limited intrusion"; and "highly intrusive, full-scale arrests, which must be based on probable cause."  Iglesias v. Commonwealth, 7 Va. App. 93, 99, 372 S.E.2d 170, 173 (1988).

Here, we focus on the second category, Terry stops.  "In Terry v. Ohio, 392 U.S. 1, 30 [ ] (1968), the Supreme Court held that a police officer may, without violating the Fourth

---

[8] We acknowledge that the notice does not indicate whether more than one motion to suppress was filed.  However, the Commonwealth's specification of the hearing date makes that largely immaterial.  The notice makes clear that the Commonwealth is appealing the circuit court's decision regarding the suppression of evidence that resulted from the January 31, 2018 hearing.  Whether that hearing and resulting decision were predicated on one motion to suppress or several, there is no confusion as to what is being appealed.

Amendment, make a brief investigatory stop of a person when the officer has a reasonable suspicion, based on objective facts, that criminal activity may be afoot." Mason v. Commonwealth, 291 Va. 362, 367, 786 S.E.2d 148, 151 (2016). The Commonwealth argues the circuit court erred in this case by concluding that Poerstel lacked sufficient reasonable suspicion to subject Jenkins to such a stop.

When reviewing the legality of a Terry stop, we are faced with a mixed question of law and fact. Lawson v. Commonwealth, 55 Va. App. 549, 554, 687 S.E.2d 94, 96 (2010) (recognizing that "ultimate questions of reasonable suspicion . . . involve questions of both law and fact" (internal quotation marks and citation omitted)). Thus, in conducting our review of such questions, "we give deference to the factual findings of the trial court but independently decide whether, under the applicable law, the manner in which the challenged evidence was obtained satisfies constitutional requirements." Jackson v. Commonwealth, 267 Va. 666, 672, 594 S.E.2d 595, 598 (2004) (citation omitted).

Jenkins correctly notes that, as the prevailing party below, he is entitled to have all factual disputes resolved in his favor and to receive the benefit from all inferences that flow from the evidence. See Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991). In this case, however, there is no real dispute as to the facts. Jenkins has not challenged that Poerstel saw what he testified to seeing or that he accurately relayed what he had learned from Bridges or the review of the records system; rather, Jenkins consistently has argued that what Poerstel saw and learned was insufficient to give rise to reasonable, articulable suspicion of criminal activity. Furthermore, in reaching its conclusion, the circuit court implicitly credited Poerstel's testimony when it stated that it found a lack of reasonable, articulable suspicion despite "list[ing] all of the things in favor of the Commonwealth." This conclusion is buttressed by the circuit court's rejection of Jenkins' arguments regarding the pat down after the initial stop

- 12 -

and the elongation of the stop to wait for the drug dog. Absent crediting Poerstel's testimony, it would have been impossible for the circuit court to resolve those issues in the Commonwealth's favor. Thus, the question in this appeal becomes whether what Poerstel learned and observed were sufficient to allow a Terry stop. To answer this question, we must "independently determine whether the manner in which the evidence was obtained meets the requirements of the Fourth Amendment." Murphy v. Commonwealth, 264 Va. 568, 573, 570 S.E.2d 836, 838 (2002).

B. The reasonable, articulable suspicion standard applied to this case

The concept of reasonable, articulable suspicion is "not self-defining," United States v. Cortez, 449 U.S. 411, 417 (1981); however, it exists when "detaining officers . . . have a particularized and objective basis for suspecting the particular person stopped of criminal activity." Id. at 417-18.

Although it may be hard to define precisely, a suspicion-based standard is less demanding than other standards commonly applied in criminal cases. As we have observed, "[a]lthough a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." Bland v. Commonwealth, 66 Va. App. 405, 413, 785 S.E.2d 798, 801-02 (2016) (internal quotation marks and citations omitted). Furthermore, it "can be established with information that is different in quantity or content than that required to establish probable cause . . . [and] from information that is less reliable than that required to show probable cause." Alabama v. White, 496 U.S. 325, 330 (1990).

In determining whether reasonable suspicion for a challenged detention exists, a court's review must be "based on an assessment of the totality of the circumstances." Harris v. Commonwealth, 276 Va. 689, 695, 668 S.E.2d 141, 145 (2008). It is an objective question that

does not turn on the subjective thoughts of an individual officer or detective, Mason, 291 Va. at 368, 786 S.E.2d at 151; however, the standard "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting Cortez, 449 U.S. at 418).

Applying these precepts to the question before us, we note that, although nothing Poerstel learned or observed prior to the stop conclusively established that Jenkins was selling narcotics, the totality of the facts learned and observed would have led a reasonable officer to suspect "that criminal activity may be afoot." Mason, 291 Va. at 367, 786 S.E.2d at 151.

The historical data that Poerstel learned from Bridges and the police department records system suggested that Jenkins had engaged in criminal activity in the past. Of particular significance were the reports from the confidential informant that Jenkins recently had been selling drugs in the area. Although such information, standing alone, may not provide justification for a stop, it is reasonable for an objective officer to consider such historical information as a part of his thought process in determining whether criminal activity may be afoot. Cf. Commonwealth v. Smith, 281 Va. 582, 591, 709 S.E.2d 139, 143 (2011) (considering historical information learned from police records system check can support an officer's reasonable suspicion); Adams v. Williams, 407 U.S. 143, 147 (1972) (recognizing tips of varying degrees of reliability can be considered in determining whether the totality of the circumstances gives rise to reasonable, articulable suspicion).

In addition to the information he learned from Bridges and the records system about Jenkins specifically, Poerstel also possessed historical information about Brooklyn Park. Specifically, it was an area that Poerstel had patrolled regularly and in which he had made numerous drug arrests. He testified, without challenge, that it was an area with "a very high level

of drug activity." As with the historical data above, standing alone, the fact that Jenkins was in an area known for drug sales would not provide a reasonable officer with sufficient suspicion to justify an investigatory stop. However, it is well established that a person's presence in a high crime or high drug activity area is a circumstance that, when coupled with other information, can support reasonable suspicion. Walker v. Commonwealth, 42 Va. App. 782, 791, 595 S.E.2d 30, 34 (2004).

Poerstel's observations of Jenkins on the day in question also provided additional information to support a finding of reasonable suspicion. Jenkins was walking with two people, one of whom had a physical appearance consistent with being a drug user. When Jenkins and that person entered the convenience store, the other companion stood outside and watched the officers' patrol car while Jenkins was in the store and out of view. He appeared to Poerstel as if he were a lookout. From discussions with multiple arrestees and confidential informants, Poerstel knew that, when police were visible in the area, drug sellers would enter this particular convenience store to allow drug transactions to be completed outside the view of the police.

Poerstel developed additional information after Jenkins exited the store and began walking down the street. Once Jenkins saw that, after circling the block, the police officers were now in his path, he immediately reversed direction. Although a citizen certainly has the right to avoid police encounters, Jenkins' immediate change of path upon seeing the officers was another suspicious factor that, when combined with the other circumstances, ultimately supported reasonable suspicion that Jenkins had just been involved in criminal activity.

Jenkins argues that there are possible innocent explanations for all of the facts that caused Poerstel to be suspicious.[9] Jenkins notes that wholly innocent people live and walk through high crime areas every day and visit the convenience store that Poerstel had been told was used for drug transactions for legitimate business purposes. Seizing on an observation by the circuit court, Jenkins notes that the features that caused Poerstel to believe that one of Jenkins' companions was a narcotics user also could describe a cancer patient.

Although Jenkins is correct that there are potentially innocent explanations for all of these factors, the reasonable, articulable suspicion standard does not demand that there be no innocent explanations for the facts observed, Morris v. City of Va. Beach, 58 Va. App. 173, 183, 707 S.E.2d 479, 483 (2011), or even that illicit conduct be the most likely explanation for what an officer learns or observes. Shifflett v. Commonwealth, 58 Va. App. 732, 736, 716 S.E.2d 132, 134 (2011) (recognizing that reasonable suspicion "requires only a moderate chance of finding evidence of wrongdoing") (internal quotation marks and citation omitted).

Here, although there are potential innocent explanations for much of what Poerstel learned and observed, the totality of what he learned and observed would have supported an objective law enforcement official having "a reasonable suspicion . . . that criminal activity *may* be afoot." Mason, 291 Va. at 367, 786 S.E.2d at 151 (emphasis added). Accordingly, the circuit

---

[9] Jenkins relies heavily on our decision in Thompson v. Commonwealth, 54 Va. App. 1, 675 S.E.2d 832 (2009). That reliance is misplaced. In Thompson, we refused to "conclude that one who loiters in an 'open market for drug sales' is . . . subject to a pat down . . ." absent additional evidence supporting reasonable suspicion. Id. at 9, 675 S.E.2d at 836. In the instant case, there was such additional evidence, including Poerstel's observations regarding the actions of Jenkins and his two companions and the reports of confidential informants that Jenkins had recently been engaged in drug transactions in the same general area. These and other additional facts discussed above are more than sufficient to distinguish this case from Thompson.

court erred in concluding that the initial stop of Jenkins was not supported by reasonable suspicion and in granting Jenkins' motion to suppress as a result of that conclusion.[10]

CONCLUSION

For the foregoing reasons, we conclude that Poerstel's initial stop of Jenkins was supported by reasonable, articulable suspicion, and thus, did not violate the Fourth Amendment. Accordingly, we reverse the judgment of the circuit court granting Jenkins' motion to suppress and remand the case to the circuit court for further proceedings consistent with this opinion.

Reversed and remanded.

---

[10] In reaching its conclusion, the circuit court stressed things that Poerstel did not observe, such as his failure to see Jenkins engage in a "hand-to-hand transaction." Although observing a hand-to-hand transaction certainly can give rise to reasonable suspicion, Jenkins correctly conceded at argument in this Court that it is not a necessary finding for there to be reasonable suspicion. We note that, when coupled with information of a similar nature and character as to that possessed by Poerstel in this case, observing a hand-to-hand transaction can be sufficient to meet the more demanding probable cause standard. See, e.g., Powell v. Commonwealth, 57 Va. App. 329, 336-37, 701 S.E.2d 831, 834 (2010); Ross v. Commonwealth, 35 Va. App. 103, 107-08, 542 S.E.2d 819, 821 (2001).